## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

UNITED STATES OF AMERICA
ex rel. CARRIE J. KURUTZ,

     :   Civil Action No. **1:08CV3019**

BRINGING THIS ACTION ON BEHALF
OF THE UNITED STATES OF AMERICA,

     :   **JUDGE BOYKO**

    Plaintiff and Relator, :   Judge _____

      v.    :   Filed Under Seal Pursuant to
         :   31 U.S.C. 3730(b)(2)

CUYAHOGA METROPOLITAN HOUSING
AUTHORITY,     :   **DO NOT SERVE**

    Defendant.  :   MAG. JUDGE BAUGHMAN

## COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

### I.  INTRODUCTION.

1. *Qui Tam* Relator Carrie J. Kurutz brings this action on behalf of the United States for treble damages and civil penalties arising from Defendant's conduct in violation of the Federal Civil False Claims Act, 31 U.S.C. §§ 3729-3733 ("FCA"). The violations alleged herein arise out of false statements and false claims for payment made by the Cuyahoga Metropolitan Housing Authority ("CMHA") to the United States Department of Housing and Urban Development ("HUD").

2. This complaint details several related areas of illegal conduct by Defendant which caused the submission of false claims in violation of the False Claims Act. These claims were made in connection with grant agreements made between CMHA and HUD for the building of two low-income housing developments and

community supportive services as part of a HOPE VI revitalization plan in Cleveland,

Ohio. These claims include the allegations that CMHA:

A. Knowingly withheld from HUD in the grant application material information regarding the massive soil instability and lack of long-term structural viability of the Riverview project site;

B. Knowingly misled HUD about the necessary scope, attendant costs, and potential impossibility of efforts to stabilize the site;

C. Falsely certified compliance with federal regulations, including by violating regulations requiring the provision of all available environmental information and requiring adherence to state laws governing the CMHA development;

D. Knowingly withheld material information from HUD environmental reviewers in order to pass environmental review;

E. Engaged in an ongoing scheme to withhold material information from HUD required to be disclosed under federal regulation, in order to continue receiving grant and other HUD subsidies and contract payments for which it was ineligible; and

F. Submitted false claims for payment from HOPE VI funds when it knew it was no longer eligible for receipt of those funds based on its violations of federal regulations upon which the grant was conditioned.

## II. JURISDICTION AND VENUE.

3. The acts proscribed by 31 U.S.C. §§ 3729-3733 and complained of herein

occurred within the Northern District of Ohio, and Defendant is headquartered, resides,

and does business in the Northern District of Ohio. Therefore, this Court has jurisdiction

over this case pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1345.

4. Venue lies under 31 U.S.C. § 3732(a).

5. The facts and circumstances which give rise to Defendant's violations of

the False Claims Act have not been publicly disclosed, as that phrase is defined under

the False Claims Act.

-2-

6.     Relator is the original source of the information upon which this complaint is based, as that phrase is defined in the False Claims Act.

7.     Relator provided disclosure of the allegations of this complaint to the United States prior to filing.

III.    **PARTIES.**

8.     The United States is the real party in interest.

9.     Relator Carrie J. Kurutz is a resident of Cleveland, Ohio.

10.    The Cuyahoga Metropolitan Housing Authority is a political subdivision of the State of Ohio, chartered in 1933 and created under sections 3735.27-3735.50 of the Ohio Revised Code.

11.    CMHA currently employs 998 persons and operates 47 individual housing developments under the leadership of CEO George A. Phillips and a Board of Directors.

12.    HUD is CMHA's primary source of funding, accounting for more than $208 million for the 2006 fiscal year.

IV.    **FEDERAL RULE OF CIVIL PROCEDURE 9(B) ALLEGATIONS.**

13.    Much of the documentary evidence necessary to prove the allegations contained herein is in the exclusive possession of CMHA or the United States.

14.    The allegations of fact contained herein are personally known by the Relator unless specifically identified as based upon information and belief.  Each allegation based upon information and belief identifies a situation in which the relator has, based upon her own knowledge and experience, a reasoned factual basis for making the allegation but lacks complete details.

-3-

## V.    BACKGROUND.

### A.    HUD.

15.    HUD was established in 1965 by passage of the Department of Housing and Urban Development Act of 1965.  Pub. L. No. 89-174, 79 Stat. 667 (codified at 42 U.S.C. §§ 3531-3549).

16.    HUD's primary mission is to encourage homeownership, support community development, and improve access to affordable housing.  HUD accomplishes this goal through a variety of grant and subsidy programs available to state and local governments.  These grant programs are essential to the continued operation of low-income housing needs of metropolitan areas nationwide.

### B.    HOPE VI.

17.    The HOPE VI program was instituted as the result of findings made by the National Commission on Severely Distressed Public Housing.  The objective of the HOPE VI program was to eradicate public housing units that were no longer fit for habitation.

18.    To effectuate the program's objective, HUD, in 1993, began offering competitive grants to public housing agencies ("PHAs") for the purpose of demolishing severely distressed housing and for revitalizing low income neighborhoods.

19.    The HOPE VI program calls for the PHA-applicant to form partnerships with the community and private entities to create mixed-finance and mixed-income housing.  The HOPE VI program also requires the PHA to contribute its own funds and resources to the project.

20.    HUD notifies potential applicants of available funds annually by means of a Notice of Funds Available ("NOFA"), which is recorded in the Federal Register.

-4-

**C.    Riverview.**

21.    The Riverview public housing complex is owned and managed by CMHA and is located on West 25th Street in Cleveland Ohio.

22.    The Riverview site is roughly triangular and is bounded by West 25th Street to the west, Franklin Avenue to the north and east, and Bridge Avenue to the South. The site forms a plateau which slopes slightly downward in an easterly direction. The plateau crests into a sharply-downward slope approximately 50 feet to the west of Franklin Avenue. The slope continues east past Franklin Avenue and flattens out (the toe of the slope) approximately 50 feet east of Franklin Avenue and 100 feet east of the crest. At the toe of the slope is Riverbed Road with runs north to south adjacent to the Cuyahoga River.

23.    Prior to 1996, the Riverview site contained two separate public housing complexes: Riverview Towers ("Towers") and Riverview Terrace ("Terrace"). The Towers is a 15-story structure occupied primarily by the elderly and contains more than 500 living units. The Terrace was comprised of nine three-story structures situated directly behind the Towers on a plateau bordered by Franklin Avenue. Collectively, the Terrace buildings housed 143 multiple-bedroom living units.

24.    In 1996, CMHA applied to HUD for HOPE VI funding for a broad plan to revitalize Riverview and another CMHA site, called Lakeview, through demolition and re-development. HUD conditionally approved a grant agreement with CMHA in 1997.

25.    Between 1997 and 2005, CMHA expended at least $16,049,947.61 in federal funds.

26.     In that time frame, CMHA used these funds to, among other things, engage various engineering and architectural firms regarding the development plan as well as to have the Terrace buildings torn down.

27.     In 2005, CMHA informed HUD that the site was unbuildable and that revitalization plans could not go forward.

28.     CMHA continues to expend HOPE VI grant money on the Lakeview site. Additionally, CMHA has expended more that $33 million in energy improvements in its properties, including Riverview Towers, pursuant to an Energy Performance Contract.

## VI.    FACTUAL ALLEGATIONS.

29.     CMHA has wrongfully obtained and expended significant amounts of federal funds for the failed revitalization of the Riverview site, by withholding material information from HUD regarding the lack of viability of the site.

30.     Specifically, CMHA had extensive knowledge of massive instability of the soil and hillside on the site long before it applied for HOPE VI funds, as well as knowledge of the need for extensive study of the site before any development could occur.  Yet, CMHA applied for HUD funding without disclosing both the extent of its knowledge on the soil and environmental conditions at the site, and  the extent of additional information which engineers who studied the site had stated had to be obtained prior to development.

31.     Instead of fully disclosing conditions at the site, CMHA presented a broad development proposal for HOPE VI funding which only partially disclosed that there was instability of the hillside only and falsely reported that the instability would be remedied for $10 million.  CMHA did not disclose the risky and environmentally-unsupported nature of the development plan before obtaining the grant and expending federal funds

-6-

on the project, nor did it disclose that extensive further study was repeatedly recommended before any development could occur.  Moreover, CMHA did not disclose that its purported remediation expenditure was not  the cost of a remediation plan to develop the site, but was instead  a proposed floor of expense in a range of increasingly expensive options preliminarily recommended in 1995 to prevent further damage to the west bank of the slope. CMHA continued in this manner until 2005, when it finally disclosed that the site was unbuildable.

32.    CMHA withheld this information in many ways and over a lengthy time period.  It withheld the nature of the site instability from its application for Hope VI funds, in its disclosures during the environmental assessment, and during the almost 10 years of post-application Riverview development planning.

33.    CMHA's lack of disclosure allowed it to funnel significant federal money into its failed project in violation of federal requirements.

34.    In addition to its extensive and repeated withholding of information, CMHA did not obtain and provide environmental information required under federal and state laws, which also allowed it to continue to expend federal money on its failed project before informing HUD that the site was unbuildable.

35.    Indeed, CMHA never obtained soil and stability studies necessary to justify any continued funding of the site, and has for years continued to expend HUD funds to maintain the existing buildings without remedying the soil instability and other environmental issues affecting the site, the surrounding roads and properties, and the Cuyahoga River.

-7-

## A.    Requirements of the HOPE VI Notice of Funding Availability ("NOFA").

36.    On July 22, 1996, HUD released a NOFA advising PHAs of the availability of $480 million in HOPE VI funds for "Public Housing Demolition, Site Revitalization, and Replacement Housing." 61 Fed. Reg. 38024 (July 22, 1996). Those funds were made available through the Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321, 1590 (1996).

37.    The NOFA specified that HOPE VI funds were reserved for the creation of institutional and physical structures that served the needs of public housing residents over the long term in a cost-effective manner. Demolition was a required component of the program. The applicant had to demonstrate that existing development was obsolete and could be replaced by housing with long term sustainability and success.

38.    The NOFA identified the threshold requirements to obtain HUD funds under HOPE VI. These requirements included among others:

- Demolition of at least one structure based on meeting standards for obsoleteness;
- Compliance with the policies, guidelines, and requirements of OMB Circular No. A-87, addressing applicable cost principles;
- Compliance with 24 C.F.R. Part 941, addressing the standards for public housing developments, including the site requirements;
- Compliance with 24 C.F.R. Part 50, addressing the federal environmental standards applicable to the site.

39.    In order to be eligible for HOPE VI funds, CMHA had to submit an application meeting the submission requirements of the NOFA, which included disclosure of the existing conditions at the site. This requirement required disclosure of any physical indicators of obsolescence, including:

-8-

- Structural deficiencies (e.g., settlement of earth below the building caused by inadequate structural fills, faulty structural design, or settlement of floors);

- Substantial deterioration (e.g., severe termite damage or damage caused by extreme weather conditions) or other design or site problems (e.g., severe erosion or flooding);

- Design and site deficiencies (e.g., high density or indefensible space);

- Major system deficiencies (e.g., peeling and chipping of lead-based paint, lack of reliable and reasonably efficient heat and hot water, major structural deficiencies, electrical system not satisfying code requirements, poor site conditions, leaking roof, deteriorated laterals and sewers, or high number of plumbing leaks);

- Environmental conditions that may jeopardize the suitability of the site or a portion of the site and its housing structures for residential use. These conditions may be determined by either a HUD-related environmental review, in accordance with 24 C.F.R. part 50 or part 58, which was previously conducted in connection with earlier assistance, or another assessment of conditions that, in the opinion of the applicant, may jeopardize suitability of the site.

61 Fed. Reg. 38024, 38030.

40. The NOFA also specified how various aspects of the application were evaluated and weighted, for the purpose of selecting those applicants who would receive funding. HUD evaluated proposals based upon the following factors:

- Whether the proposal would lessen the concentration of low-income residents (20 points);

- Whether there was a need for demolition, revitalization, or replacement (25 points);

- Whether the proposal incorporated any self-sufficiency programs (20 points);

- Whether the proposal incorporated policies promoting positive incentives and tougher expectations (15 points);

- *The local and national impact of the proposal* (25 points);

-9-

- Involvement of the community and development of partnerships (20 points);

- The need for funding (20 points);

- *The quality, feasibility, and sustainability of the proposal* (25 points);

- *The capability of the PHA to execute the proposal* (15 points); and

- Whether the proposal would materially assist the PHA and HUD in meeting their obligations under a civil rights consent decree (20 bonus points).

Id. at 38027-38029 (emphasis supplied).

41.    Thus, HUD specifically identified that these factors, including the quality, feasibility and sustainability of the proposal, was material to its decision to award funds.

42.    The evaluation of the quality, feasibility and sustainability of the proposal involved determination of whether determining the proposed demolition and revitalization or replacement housing was comprehensive and effective as measured by the objectives and goals of the proposed plan; whether proposed program activities meet the objectives of the HOPE VI program; whether the proposed program activities will be accomplished within a reasonable time and expense; whether the proposed activities are coherent, comprehensive, and integrated; whether the proposed activities are sustainable; and the potential success of the proposed program. Id. at 38029.

**B.    CMHA's Eligibility for HOPE VI Funds.**

**(1)    Federal Regulatory Requirements for HOPE VI Funding.**

43.    Numerous federal regulations govern CMHA's eligibility for HOPE VI Funds, and required CMHA to identify and disclose the true nature of the conditions at the site.

-10-

44.     There are stringent environmental review requirements applicable to the CMHA's proposed development. 24 C.F.R. Part 50 requires HUD applicants to comply with the National Environmental Policy Act ("NEPA") and other applicable authorities described in §§ 50.1 and 50.4, including historic properties laws, flood insurance, floodplain management and wetland protection laws, coastal area protection and management laws, sole source aquifers laws, solid waste management laws, and HUD environmental standards. 24 C.F.R. Part 51.

45.     In addition to requiring applicants to comply with these laws, Part 50 provides for a separate environmental review to ensure compliance with NEPA and other applicable authorities. This environmental review process is designed to ferret out those projects with a "significant adverse environmental impact," as it is the "policy of the Department to reject proposals which have significant adverse environmental impacts." § 50.3.

46.     Thus, all HUD-funded development projects must go through an environmental review process, as described in 24 C.F.R. Part 50, before development can begin on the site.

47.     These environmental reviews are conducted by HUD or, as allowed by 24 C.F.R. Part 58, by designated "responsible entities." For public housing agencies like CMHA, a responsible entity for environmental review purposes could include a unit of local government within which the project is located that exercises land use responsibility, or if HUD determines infeasible, the city, or if HUD determines this infeasible, the state. 24 C.F.R. § 58.2(a)(7)(ii)(B). By information and belief, a local HUD representative conducted the environmental review for the CMHA site.

-11-

48. While HUD ultimately is responsible for conducting the environmental review, the collection of data and studies as part of the information contained in the environmental review may be done by an applicant, such as CMHA, and HUD may use that information in completing its review. 24 C.F.R. § 50.32. In the case of HOPE VI projects, the applicant was affirmatively required to certify in its application that it

> has provided or will provide HUD with any documentation that the Department needs to carry out its review under the National Environmental Policy Act (NEPA) and other related authorities and otherwise will assist HUD in complying with 24 C.F.R. Part 50 environmental review procedures.

Form HUD-52820-A (July 1996).

49. HUD's initial environmental review is called an Environmental Assessment ("EA") or a Phase I Environmental Assessment, and is documented by way of HUD Form-4128. A Phase I environmental site assessment must be completed in accordance with the American Society for Testing and Material (ASTM) Standards E 1527-97, as amended, for each affected site.

50. The factors relevant to the ultimate finding in the EA are described in Chapter 5 of the Environmental Assessment Guide for Housing Projects, Handbook 1390.2. There are 15 factors to be considered in completing the EA, including:

- Physical Site Suitability (Factor 1.1);
- Soil Stability and Erodability (Factor 1.2);
- Natural Hazards (Factor 1.3);
- Hazards and Nuisances (Factor 1.4);
- Air Quality (Factor 1.5);
- Displacement (Factor 1.6);
- Energy Consumption (Factor 1.7);

-12-

- Water Supply (Factor 2.1);

- Waste Water (Factor 2.2);

- Storm Water (Factor 2.3);

- Solid Waste (Factor 2.4);

- Water Resources (Factor 3.1);

- Unique Natural Features and Areas (Factor 3.2);

- Important and Productive Farmlands (Factor 3.3);

- Vegetative and Animal Life (Factor 3.4).

In addition to providing HUD environmental reviews with guidance, the Handbook also includes a checklist for reviewers to use when completing the EA. Handbook 1390.2 Appendix C. That checklist prompts reviewers to make certain inquiries with respect to each factor.

51.     The EA makes findings regarding the potential impact of development on a range of environmental factors, including the laws and regulations specified in 24 C.F.R. Part 50.

52.     Based upon the results of the EA, the reviewer must determine whether there is a Finding of No Significant Impact ("FONSI"). The reviewer also recommends whether the project is approved, approved subject to conditions, or s rejected (Form-4128).

53.     If the development is approved with a FONSI, the applicant must submit a Request for Release of Funds (RROF). The applicant may not commit any HUD funds until the EA has been completed, approved, and the RROF submitted. *See, e.g., §* §58.22(a); 58.71.

-13-

54.     If there is not a FONSI—if the Phase I assessment recognizes environmental concerns or the results are inconclusive--then an Environmental Impact Statement ("EIS") is required.   The EIS process is often referred to as a Phase II Environmental Assessment, and is a far more detailed assessment of potential environmental impacts than an EA.

55.     Because it is HUD's policy to reject proposals with significant environmental impacts, a FONSI is an important part of moving a project forward with HUD funding.

56.     In addition to the initial EA, there are ongoing environmental review responsibilities for both the applicant and for HUD.  HUD applicants, such as CMHA, have a duty to report changes that would affect the original EA findings.  Under 24 C.F.R. § 58.47, for example, CMHA must inform the Responsible Entity promptly of any proposed substantial changes in the nature, magnitude or extent of the project, or of any new circumstances and environmental conditions which may affect the project or have a bearing on its impact, such as concealed or unexpected conditions discovered during the implementation of the project, or of any alternative not in the original findings.

57.     In turn, HUD must re-evaluate and update the environmental review whenever "the basis for the original environmental or compliance findings is affected by a major change requiring HUD approval in the nature, magnitude or extent of a project and the project is not yet complete." § 50.36.

58.     The applicant is also required to comply with 24 C.F.R. Part 941, which governs the use of federal funds in the development of public housing.  Part 941 imposes several conditions on applicants with respect to the selection of sites for

-14-

construction of public housing. Section 941.202(e) requires, among other things, that "[t]he site [] be free from adverse environmental conditions, natural or manmade, such as instability, flooding, septic tank back-ups, sewage hazards or mudslides."

59. Additionally, §941.304(l)—consistently with similar obligations imposed by 24 C.F.R. Part 50 and the HOPE VI grant application discussed above—requires applicants to submit to HUD "[a]ll available environmental information on the proposed development (to expedite the HUD environmental review)."

60. Finally, § 941.203(b)(2) conditions HUD funding on the applicant's compliance with "[a]pplicable State and local laws, codes, ordinances, and regulations." Among other things, Ohio building regulations mandate that a builder undertake extensive soil and foundation investigation prior to any development of a site resting on questionable soils. Ohio Admin. Code § 4101:1-18-01. Soils are questionable "[W]here the classification, strength or compressibility of the soil are in doubt . . . ." Id. Ohio regulations also require entities responsible for developments to develop an erosion and settlement control plan, submitted to and approved by the approving agency prior to any earth-disturbing activity on the development area. Ohio Admin. Code § 1501:15-01-03. This plan would include the early identification of " [t]he types of soils within or affected by the development area and the location of all highly erodible or unstable soils." Id. at (C)(7).

### (2) CMHA Certifications to Obtain Funding.

61. In addition to the requirements imposed on the applicant by the NOFA and supporting laws, CMHA was required to provide a host of affirmative certifications in the application as to both the conditions existing at the time of submission and compliance with the regulatory framework. Thus, CMHA was not only bound by the governing law

and regulations, but also affirmatively certified that it was and would remain in
compliance with the certifications in its application.

62.    Relevant to the allegations contained herein, CMHA certified that it "will
comply with all policies, procedures, and requirements by HUD for the HOPE VI
program, including the implementation of HOPE VI activities in a timely, efficient, and
economical manner."

63.    CMHA certified that "[p]ublic housing development activity (including on-
site reconstruction as well as off-site replacement housing) will be conducted in
accordance with 24 C.F.R. 941...." As also articulated in Section VI.B(1) above, 24
C.F.R. Parts 50 and 58—as well as the grant application—required that CMHA provided
all available environmental information related to the project (§ 941.304(l)); that the
CMHA site be free from adverse environmental conditions "such as instability," (§
941.202(e)); and that CMHA will comply with applicable state and local building
ordinances ( § 941.203(b)(2)).

64.    CMHA also certified that it

> has provided or will provide HUD with any documentation that the Department
> needs to carry out its review under the National Environmental Policy Act (NEPA)
> and other related authorities and otherwise will assist HUD in complying with 24
> C.F.R. part 50 environmental review. The PHA agrees . . . not to acquire,
> rehabilitate, convert, lease, repair, or construct property, or commit HUD or local
> funds to such program activities with respect to any eligible property until HUD
> approval under 24 C.F.R. part 50 is received.

Part 50, as discussed above, provides for a separate environmental review before a
project may move forward; and that there must be a finding of no significant impact on
the environment (including soil stability) before Part 50 approval is obtained. HUD
environmental review officials may rely on the applicant to provide any available
environmental information pertaining to the proposed site, 24 C.F.R. § 50.32.

-16-

65. CMHA also certified that it will comply with the "policies, guidelines, and requirements" of OMB Circular A-87. OMB Circular A-87 mandates, among other things, that costs paid pursuant to a federal grant program "[b]e authorized or not prohibited under State or local laws or regulations," which, in Ohio, includes among other things the undertaking of a soil stability study when the site is located on "questionable soils," Ohio Admin. Code 4101:1-18-01.

66. CMHA also certified that "[t]here are no environmental factors, such as sewer moratoriums, precluding development in the requested locality."

67. After HUD grant approval was obtained, CMHA had to submit additional certifications before it could access grant funds. First, it submitted a Request for Release of Funds ("RROF"), on HUD Form 7015.15, to HUD, in which it further certified that it provided HUD with any new environmental information. After this form was submitted to the local HUD field office, it was submitted to HUD's main office for review. The RROF also included the following language:

> **Warning: HUD will prosecute false claims and statements. Conviction may result in criminal and/or civil penalties. (18 U.S.C. 1001, 1010, 1012; 31 U.S.C. 3729, 3802)**

68. After submission of the RROF, HUD authorized the use of grant funds by transmitting a certified Form 7015.16, Authority to Use Grant Funds, which notes the date on which CMHA submitted the RROF.

69. Finally, CMHA obtained payment from HUD through a payment voucher, HUD Form 50080-URP, which required CMHA to specify the funds requested by line item, and to certify that the data and funds in the voucher are correct and "not in excess of the immediate disbursement needs for this program." The payment voucher contains the same warning as the RROF about the prosecutions of false claims and statements.

-17-

C.    **CMHA HOPE VI Application.**

70.    On September 10, 1996, CMHA submitted its application for $40 million in HOPE VI funds for the demolition of the Terrace buildings and construction of new housing, as well as for the renovation of an additional CMHA property, Lakeview.

71.    CMHA's development proposal called for development of new mixed-income housing comprised of subsidized low-income units as well as high-value private homes.  CMHA proposed to construct some 380-425 new units at Riverview, utilizing not just the area formerly occupied by the Terrace buildings, but also the portion of the site extending down to Riverbed Street.

72.    When CMHA's HOPE VI grant application was submitted to HUD, and for more than 30 years before, CMHA had extensive knowledge of serious soil instability at the site.  CMHA had received repeated firm engineering recommendation that the undeveloped portion of the site was likely unbuildable and that the risks of any other development on the site were presumptively unacceptable without extensive further study.

73.    CMHA disclosed very little to HUD regarding this soil instability, and indicated that remediation was available at a cost within the HOPE VI funding it sought. The application contains only two references, as follows:

> Riverview Terrace is a poorly planned development characterized by unstable and slipping ground conditions which pose a life threatening hazard to residents, especially small children.

CMHA Grant Application at 4.

> In 1995, in response to concerns about unstable site conditions along the Riverbank, CMHA ordered a slope stability evaluation to determine the extent of the problem.  The evaluation, performed by Stilson & Associates, Inc., indicated that the entire west bank slope which Riverview Terrace occupies is unstable. The extent and cost of the treatment to remedy the slope is considerable and

-18-

CMHA does not have the financial means to absorb such a costly undertaking at this time. Site conditions are becoming increasingly dangerous in that cracked and sloping concrete is now a characteristic feature of many common areas including playgrounds, parking lots, and walkways. Additionally, numerous sink holes continue to appear throughout the site posing a life-threatening condition for the inhabitants of this development, especially small children. The sink holes are the result of improper ground compaction prior to construction. Unfortunately, unsuitable 'ground fill' is now rotting, causing existing soil problems to increase. In the past, the method of treatment has been to fill the sink holes as they appear, but a heavy rainfall typically re-opens existing sink holes or creates new problem areas.

CMHA Application at 7.

74.   The 1995 study, the only site study disclosed, focused solely on the soil stability to the north of the proposed site and did not disclose a massive amount of additional information regarding the actual scope of the viability issues with the site— issues which were not in fact known to be remediable. Rather, engineers had long cautioned CMHA that extensive other study was required in order to be able to plan *any* development of the site due to massive instability. As explained in detail in below, CMHA withheld large amounts of site information obtained from the years 1960 to 1995.

75.   CMHA reported in its application that "modernization costs [for Riverview] as estimated at approximately $14.3 million to completely renovate the dwelling units and an additional $10 million to correct site deficiencies, including stabilization of the riverbank hillside. Application at 160.

76.   HUD approved CMHA's application and awarded $29,733,334.[1]

77.   The Grant Agreement between HUD and CMHA governing the HOPE VI project became effective on October 29, 1997 (Grant No. OH12URD003I196).

_____

[1] Of this amount, $12,434,984 was earmarked for the Riverview Revitalization Project. The remaining $17,299,250 was earmarked for the modernization of Lakeview, another CMHA public housing complex.

78.    In accordance with the dictates of the NOFA, the Grant Agreement

provided that CMHA agree:

- To carry out the program in accordance with the provisions of this NOFA, applicable law, the approved application, and all other applicable requirements, including requirements for mixed finance development, if applicable;

- To comply with such other terms and conditions, including recordkeeping and reports, as HUD may establish for the purposes of administering, monitoring, and evaluating the program in an effective and efficient manner;

- That HUD may require the PHA to procure a program manager if selected for an award, as a condition of the grant agreement; and

- That HUD may withhold, withdraw, or recapture any portion of a grant, terminate the Grant Agreement, or take other appropriate action authorized by the 1996 Appropriation Act or under the Grant Agreement or ACC Amendment if HUD determines that the recipient is failing to carry out the approved revitalization program in accordance with the terms of the application as approved and this NOFA.

## D.    **CMHA's Knowledge of Massive Soil Instability Prior to Application.**

79.    The Riverview site was developed by CMHA in the early 1960s. Prior to

moving forward with the development, CMHA commissioned a subsurface geotechnical

study of the site by Professor W. S. Housel of the University of Michigan Research

Institute ("1960 Study"). CMHA's structural engineering firm had recommended that

CMHA postpone finalization of development plans (and specifically, foundation types)

until the completion of soil testing, the firm recommended retainer of Housel as a

consultant of the mass stability of the slope and the completion of a comprehensive

series of soil bearings and samplings (January 22, 1960 Letter from structural

engineering firm, Barber, Magee & Hoffman, to the architects).

80.     In a series of letters and reports in 1960, Housel soundly concluded that

mass stability at the site was in doubt and that only protracted study of the site

conditions would ensure a complete and accurate analysis.

81.     On February 19, 1960, for example, Housel presented his opinions based

upon an initial inspection of the Riverview site, noting that:

> It is possible that progressive settlement could be going on in this area
> due to deep seated movement. . . . The only way that such movement would be
> apparent would be by levels which had been taken over a long period of time.

Housel cautioned that no further development be made at the site until "the mass

stability of the area as a whole can be reliably determined in advance." February 19,

1960 Housel Letter to CMHA structural engineers.

82.     Mr. Housel, through his associate U.W. Stoll, again warned the architects

in a July 22, 1960 letter of the potential stability issues associated with construction at

the Riverview site: "[A]ll concerned should be reminded of the seriousness of building a

major housing project under the conditions at Riverview Terrace.  Our Stability Analysis

indicates that soil resistance factors ordinarily omitted may be assigned to bring the

problem within design range.  This involves a calculated risk somewhat out of the

ordinary."

83.     On August 23, 1960, after several months of testing soil at the Riverview

site, Housel expressed his opinion that additional testing was necessary to complete his

evaluation:

> In the final analysis, I will want a more reliable and factual basis before
> committing myself on final recommendations, and feel that you and the Housing
> Authority you represent should take the same position.  This all adds up to the
> need for additional expenditure, and I wouldn't be able to say what finally may be
> involved until a program is worked out.

84.    On September 14, 1960, in response, the architects advised Housel that

any additional analysis over an extended period of time would not be approved:

> Investigations spanning an extended period of time, however, cannot be approved.   Delay in starting design drawings is placing an extremely heavy financial burden on us, and for this reason if no other, prompt and specific recommendations are needed.   Time is of the essence; any new information must be secured and evaluated within 30 days.   No long period of observation, as suggested in your letter of August 23rd, can be undertaken.

85.    On October 5, 1960, Housel again reiterated his concern for the physical

conditions at the site, and the need for more extensive study of the magnitude of

movement at the site:

> Reservations that we have expressed concern the ultimate construction of buildings in an area where there is a calculated risk involved that is somewhat higher than we would ordinarily care to accept. *The risks involved cannot be accurately evaluated until the designs have been worked out and we have some information on the magnitude of the movement that is taking place*. . .
> .
>
> We regret that there has been a delay in starting design drawings, but specific recommendations have been presented which is as far as we can go now.  These recommendations will not be changed in our final report.  This report will really do little more than present the supporting evidence which we have used in preparing these recommendations.  The difficulties involved concern the physical conditions at the site more than the need for any new information. Completion of our work is being delayed simply by the fact that we have not received any additional authorizations as requested in our letters of August 18 and 23.  I thought that my opinion, that the hazards involved in building on this site were such that I didn't feel free to submit a final or favorable recommendation until specific information on the rate of movement was available, had been made clear
>
> * * * *
>
> [w]e felt that it might be possible to design structures utilizing the side hill area and lower area in the vicinity of Riverbed Avenue, but that any structures built there would have to withstand slow, progressive displacement toward the river. We recommended that you proceed with the design of these structures, but also indicated that before *being finally committed to the construction of buildings in the area we would have to know more about the character and magnitude of the movement taking place*.  Consequently, we recommended that observation of both settlement and lateral displacement be initiated at the

earliest opportunity so that some reliable measure of the movement would be available before construction of the buildings was actually undertaken. . . .

Letter at 1,4, emphasis added. Continuing, Dr. Housel reaffirmed his view that "plans for utilizing the side hill area and the area near Riverbed Avenue would be subject to further study."

86.    Housel released his findings in November 1960. Therein, Housel concluded that the analysis of mass stability at the site presented a particularly difficult problem, and that any further development, particularly the critical side hill area, would require extensive further study.

87.    Mr. Housel specifically opined:

Design limits shown as overload ratio contours have been indicated on the Boring Location Plan, segregating the area of adequate mass stability on the high ground, bordered by West 25th Street, from the side hill area. It has been concluded that in this side hill area, the progressive movement toward the river is of sufficient magnitude to make building construction a questionable matter. This is not intended to rule out building in the side hill area, but to **designate it as an area where the calculated risk is greater and where special consideration must be given to designing buildings capable of withstanding progressive movement. This is also the area where the writer has indicated that observations should be made of settlement and lateral movement before proceeding with further development.**

These considerations and recommendations have been presented in conferences and by correspondence included in Appendix A, and have led to the present proposal by the Architects and Engineers known as Scheme "H". In Scheme "H", it is proposed to build "High Rise" structures, of some 15 stories, on the high ground adjacent to West 25th Street, within the overload ratio contour of $R = 1.33$. Three story flats have been proposed in a band paralleling the bank and, generally, 50 feet from the top of the slope. Mass stability in this area is represented by an overload ratio of approximately $R = 2.0$, indicative of slow progressive settlement within a range commonly encountered in building construction. . . .

* * * *

Present development does not include any building construction in the more critical side hill area referred to above. **It is understood that development of this area will be the subject of further study.** Such further

-23-

development, insofar as the writer's recommendations are concerned, will be predicated upon observations of settlement and lateral movement to provide a specific measure of its character and magnitude. These observations should include level measurements and alignment surveys on a sufficient number of moments and over a sufficient period of time to establish the pattern and magnitude of progressive movement. It has also been suggested that tiltmeter observations be included to determine the actual sliding planes on which the mass is moving and to supplement the other surveys of settlement and lateral movement. These surveys should be initiated at the earliest possible time and coordinated with plans for further development.   Observation points are suggested on two major sections where borings have already been made, but should also include the extremities of the Riverview area to provide a complete pattern of the movement. No further details of these studies will be provided in this report, as this matter is believed to be of sufficient importance that a conference with the Architects and Engineers should be arranged to discuss the survey in detail and work out a well-integrated survey program.

Housel Report at 9-10, emphasis added.

88.     Housel further noted that "[d]ue to the complex stratification encountered

at this site and the wide variation in texture and structure of the soils, it has been

impossible to prepare a composite soil profile and determine composite design shear

values which would be applicable to the site as a whole." Report at 4.

89.     Housel resoundly concluded that because of the hazards of building on

the site, he could not give a final recommendation on development of the site without

more specific information on the rate of movement at the site.

90.     Upon information and belief, notwithstanding the repeated warnings of

Professor Housel, no soil stability studies were conducted after Housel presented his

findings and before the Towers and Terrace were constructed.

91.     Neither the 1960 study nor its recommendations were disclosed to HUD at

the time of the grant application.

92.     In 1984, Transitional Housing—an entity not affiliated with CMHA—

purchased the property immediately to the north of the Riverview site, on the corner of

-24-

West 25th Street and Franklin Avenue.  Transitional Housing observed significant earth movement in the form of extensive cracking in its parking lot as early as the 1984.  By 1989, the vertical and horizontal displacement of the crack measured 3.5 inches and 2.2 inches, respectively.

93.    In 1986, the Towers underwent an $8 million dollar renovation using HUD grant funds.

94.    In 1993, Transitional Housing commissioned a study of the slope behind its facility ("1993 Study").  The objective of the study, which was completed by the David V. Lewin Corp., was to establish a mode of instability and to develop alternative methods of remediation.

95.    The 1993 study reports that "a fairly massive soil movement is occurring, apparently extending to the River."  The study opined that "the movements presently being experienced cannot continue indefinitely without eventually initiating a larger movement that would not only jeopardize the use of the parking lot but also the building" and stated that the instability caused by the slope movements was widespread, "extending to the north and south for a total distance of well over 1,000 feet."

96.    The 1993 study suggested several remedial steps—including load reduction, drainage, retaining systems, and regrading—but advised that the remedial measures:

> should not, and, in part, cannot be implemented *without first taking into account the fact that the movement is occurring to the north, south, and east of your property.*  We believe that any remedial action, if only provided on your property, would serve to reduce the movement on a temporary basis only. *It is important to discuss the above with your neighbors in order to develop a joint effort to stop the movement on a more permanent basis*.

Emphasis added.

97.    Consistent with this recommendation, Transitional Housing hosted a meeting for the neighbors, including CMHA, to discuss the widespread soil erosion and its direct effect on the Cuyahoga River.

98.    Relator was advised by a then-member of the Cuyahoga Remedial Action Plan Committee that CMHA participated in that meeting.

99.    However, upon information and belief, CMHA never provided this information to HUD.

100.    In 1991, Calvin Singleton & Associates commissioned a study on behalf of CMHA for the purpose of analyzing the soil behind CMHA's headquarters, located on the corner of West 25th Street and Detroit Avenue.  This study noted that a significant portion of the site was supported by fill material.

101.    Because of the nature of the soil profile, the Singleton study recommended that detailed foundation considerations would have to be given to any new structures developed on the site.  In addition to proposing certain foundation considerations, the consultants recommended additional tests to "verify that foundation bearing surface conditions are compatible with the design assumptions and recommendations, and to be certain that the recommendations are correctly interpreted and implemented."  Report at 31.

102.    Upon information and belief, CMHA never disclosed to HUD the nature of the soil conditions reported by this study, nor that fill material composed a significant portion of the Riverview site.

103.    In 1995, CMHA commissioned Stilson & Associates, Inc. to perform another soil stability study ("1995 Study").  Unlike the 1960 Study which evaluated the

-26-

plateau between West 25th Street and Franklin Avenue, the scope of the 1995 Study

was limited to the slope area extending north from Franklin Avenue and east down to

the Cuyahoga River. None of the boring sites which provided the data for the study

were located on or near the Riverview site, nor did the study make any specific

reference to the site.

104. With respect to previous stability studies of the slope, the report noted:

Three inclinometers were installed by others between 1991 and 1992 to measure the movement of the west bank slope. Two inclinometers were installed in 1991 by ODOT adjacent to the Detroit-Superior bridge. Inclinometer 1, was installed at the top of the slope, hand inconclusive results. Inclinometer 2, which was installed at the bottom of the slope, indicated as much as 1.6 inches of movement in a southeast direction through March, 1993. There was no movement recorded below a depth of 51 feet, or elevation 555. After March 1993, readings could no longer be taken below a depth of 47 feet because of an abrupt distortion in the casing. No readings have been taken in Inclinometer 2 since February 1994.

A third inclinometer was installed at the top of the slope behind Transitional Housing in 1992. Between December 1992 and July 1994, this inclinometer indicated approximately 1.5 inches of movement had occurred in a downslope direction at a depth of 75 feet.

105. The 1995 Study made the following findings:

[T]he evaluation indicated that the entire west bank slope of the project area is unstable. It appears the instability is a slow moving, creep-type failure. However, because the slope is unstable, even minor changes in the surface or subsurface conditions could cause further instability. Consequently, *no development of any part of the site should be performed without careful analysis of the surface and subsurface conditions and the effects of the development on both the existing and potential instability.*

Emphasis added.

106. The 1995 Study evaluated four courses of action to prevent further

damage to the west bank of the slope, but notes that each of these were considered to

be "preliminary" with the potential for causing potential instability, including at the

riverbank. The study recommended that additional investigation and analysis was

-27-

required to "actually design any treatment and determine its effects on the existing failure." Report at 17.

107.   The four preliminary treatments considered were:

| Measure | Approximate Cost |
|---|---|
| Stone Columns with drainage | $13,750,000.00 |
| Stone Columns with berm | $13,500,000.00 |
| Cantilever Wall | $14,500,000.00 |
| Tied-back Wall | $10,000,000.00 |

108.   The Report stressed that "no development of any part of the site should be performed without careful analysis of the conditions and the effects of the development on the existing site."

109.   As articulated above, CMHA was obligated to disclose all information known to it about the site, both in the grant application and the environmental review. In particular, CMHA was required to advise HUD of the existence and findings of all environmental studies of the Riverview site, including the 1960, 1991, 1993, and 1995 Studies but failed to disclose to HUD the nature and scope of these findings.

110.   In its application, CMHA made no reference to the 1960 Study or its findings, despite the fact that—at the time of the application was submitted—that study was, upon information and belief, the only one which had ever addressed the specific problems at the Riverview site itself.  Notably, although CMHA's grant application proposed new construction past the crest of the hill and down to Riverbed Road, CMHA

-28-

did not inform HUD that the 1960 Study reported that such construction was "questionable" and that any plans to build on the side hill area were not recommended without significant additional investigation.

111.    Finally, no reference was made in CMHA's grant application to the 1993 Study, which concluded that the instability of the hillside was "widespread" and thus affected the Riverview site.  CMHA was obligated to disclose this information to HUD in its application and did not.

112.    CMHA knowingly withheld the findings of these studies from HUD because their existence would have rendered suspect any decision to build on the Riverview site, and thus would have jeopardized CMHA's chances of being awarded a HOPE VI Grant.

### E.      CMHA Continued to Withhold this Information During the Environmental Assessment.

113.    Furthermore, CMHA failed to provide these studies to the HUD officials who completed the EA as required by 24 C.F.R. Part 50, despite its obligation to do so. See ¶¶ 48, 56.  As described above, the EA includes several points of inquiry, based upon the requirements found in 24 CFR § 50.1 and § 50.4, that specifically requests the information withheld by CMHA.

114.    The EA makes specific "Environmental Findings," under which the reviewer must indicate whether the anticipated impact associated with "soil stability and erodability" is "none," "minor," or "major," whether the conditions "require mitigation or modification," and whether there is any documentation that supports the official's finding.   HUD Form 4128, Section G, Findings 1.2.

-29-

115. HUD Handbook 1390.2 establishes the minimum requirements for

"environmental assessments and conformity with related environmental laws" as well

as to provide technical guidance in making findings regarding environmental impacts

during the environmental review. HUD Handbook 1390.2, Chapter 1.

116. On the topic of soil stability and erodability, HUD Handbook 1390.2

provides that:

> To be suitable for a building, a soil must be capable of adequately supporting its foundation without settling or cracking.
>
> * * * *
>
> Since erosion, slope stability and drainage characteristics depend not only the steepness of the slope but also on the materials of which it is composed, soils suitability is an important consideration.

Chapter 5, Factor 1.2.

117. The environmental reviewer must be able to assess the following

questions:

- "Does the project involve development of an erosion sensitive area (near water, on a steep slope, on a sandy or silty soil)? If so, is erosion control included as part of the plan?"

- "Is there any visible evidence of soil problems—foundations cracking or settling, basements flooding, etc.—in the neighborhood of the project site?"

- "Have soil studies or borings been made for the area? Do they indicate marginal or unsatisfactory soil conditions?"

- "Is there evidence of slope erosion on or near the site?"

- "Does site clearance require vegetation removal? How many acres will be cleared and for how long? Are temporary control facilities provided?"

- "Is there evidence of previous erosion or sedimentation on the site?"

- "Is there evidence of high water table or poor soil conditions where septic systems are to be installed?"

Handbook 1390.2, Chapter 5 at 5-7, 5-8.

118. The HUD Handbook specifies that the environmental finding in the EA is then evaluated under the following standard:

> The evaluation of the impact consists of estimating the extent to which existing or potential soil problems are a hazard to the project, its users and others, and the extent to which those problems will increase or decrease on and off the site as a result of the project.

> There is 'no impact' if an existing soil problem is demonstrably corrected as part of the project proposal or if problems are not present. There is a 'minor impact' if they are present only to a very small degree.

> There is a 'major' impact if the soil problems are present and severe, of if the proposed project will increase the potential for building failure, erosion and sedimentation, and inadequate mitigation measures are proposed to correct these conditions.

HUD Handbook 1390.2, Chapter 5, at 5-8. 5-9.

119. Thus, a reviewer who reasonably relied on CMHA's application—which disclosed no present and severe soil problems, and instead only partially disclosed a stability problem with an alleged remediation plan—could incorrectly conclude that there was "no impact" from CMHA's proposal.

120. CMHA withheld information specifically identified in the EA and the HUD compliance documents as pertinent to the EA, allowing a "no impact" finding to be made and precluding a Phase II assessment.

121. Despite the fact that soil stability is a significant factor when completing the EA and in turn awarding a HOPE VI grant, CMHA knowingly withheld relevant soil information from HUD, including the 1960 Study and the 1993 Study.

-31-

122.   As a consequence of CMHA's failure to fully advise HUD of the existence of all available environmental information—all of which was known to CMHA years prior to the submission of its HOPE VI grant application—the EA completed on October 9, 1996 resulted in a Finding of no Significant Impact ("FONSI"). Significantly, the reviewer found no issue related to the soil instability or erodability at Riverview, and included no comments regarding the 1995 Study or CMHA's proposed remediation.

## F.   As a Result of CMHA's Nondisclosure, HUD Approved CMHA's Application.

123.   HUD approved CMHA's application and awarded $29,733,334 in funds. The Grant Agreement (Grant No. OH12URD0031196) between HUD and CMHA became effective in October 1997.

124.   On November 1, 1998, HUD sent CMHA a letter relating its concerns regarding the stability of the Riverview site, and conditioning further progress on first securing additional information regarding the soil stability.

125.   In response, CMHA then Executive Director, Terri Hamilton Brown, sent HUD a letter on January 7, 1999 which stated:

> In your [HUD's] November letter, a number of revitalization plan concerns were expressed about the Riverview redevelopment, including issues related to site stabilization. . . . Although we recognize the importance of these issues, these questions cannot be adequately addressed until a development team is formed and initiates a realistic plan for this site."

However, the letter, like the grant application, failed to provide any detail regarding the soil stability at Riverview, despite CMHA's awareness of the issue.

126.   Based on this, CMHA received HUD approval to demolish all but two of the Terrace buildings in early 1999.

-32-

127.    On June 17, 1999, HUD conditionally approved the Riverview plan, but

cautioned:

> Upon demolition, CMHA must have a geotechnical investigation done to
> determine the suitability of the site for building foundations and draining. The
> Slope Stability Evaluation by Stilson & Associations, Inc. for CMHA states, in
> part, that 'even minor changes in the surface or subsurface could further increase
> the instability of the slope.' Therefore, further investigation is necessary before
> any redevelopment plans can move forward.

Further, the letter stated:

> Before the developer selection process begins, the Authority should decide what
> the vision for the Riverview Market District is and what role it intends to play.
> What is the plan for the site? We understand the difficulty of developing the site
> and will offer any appropriate assistance to the Authority in developing a vision.

128.    Finally, the letter instructed that "[t]he viability of the Riverview High Rise

must be thoroughly addressed to the impact of the buildings on any redevelopment

efforts."

129.    In August 1999, CMHA responded to HUD's letter of June 17 by agreeing

to hire a HOPE VI Coordinator as well as a consultant to conduct a design charette for

the purpose of developing a vision for the Riverview Market District by June 2000.

Again, however, CMHA breached its continuing obligation to HUD to disclose relevant

environmental information affecting the Riverview project.

130.    On December 17, 1999, HUD granted conditional approval to CMHA to

demolish the remaining two Terrace buildings:

> The Authority submitted an application to demolish an additional eighteen units at
> Riverview on March 29, 1999. CMHA has proposed the demolition of the
> eighteen units based on 24 C.F.R. Part 970.6 (b): 'In the case of demolition of
> only a portion of the development, the demolition will help to ensure the viability
> of the remaining portion of the project. . ." CMHA is seeking to reduce the
> density in the development, create parking for the elderly residents in the high-
> rise and less the poverty level.

However, HUD reiterated the need for further evaluation of the site's stability:

-33-

In addition, upon demolition, CMHA must have a geotechnical investigation done to determine the suitability of the site building foundations and drainage. The Slope Stability Evaluation by Stilson & Associates, Inc. for CMHA states, in part, that "even minor changes in the surface or subsurface conditions could further increase the instability of the slope." Therefore, further investigation is necessary before any redevelopment plans can move forward.

## G. CMHA'S Continued Efforts to Withhold Information in Order to Retain HUD Funds.

131. In early 2000, CMHA selected Good Clancy & Associates ("GCA") as the primary developer for the Riverview HOPE VI Project. In a letter dated February 23, 2000, from Michael Bowen (CMHA's HOPE VI Coordinator) to Terri Hamilton, Bowen stated:

Importantly, GCA clearly understood the difficulties and challenges that CMHA face [sic] in developing the site. GCA clearly understands that the stability of the slope has to be addressed before any discussion can proceed regarding number of units and unit type."

132. The development contract entered into between CMHA and GCA provided that any soil tests, boring, and subsurface analysis would not be GCA's responsibility, but rather CMHA's.

133. In March 2001, GCA submitted its plan for development of the Riverview site, wherein it made the following observations:

**The site covers more than 20 acres, although due to geotechnical instability, less than half of the land is buildable.** Divided by Franklin Street, the Riverview parcels stretch nearly 2,000 feet along West 25th. At its narrowest—and most unstable—the site is less than 100 feet from the edge of the bluff; at its widest, it is more than 650 feet across. The site can be divided into three zones: unstable, marginally stable, and stable . . . Some of the least stable land lies at the northern end of West 25th Street; in fact, the parking lot of one building has settled more than three feet. The largest portion of the stable land is directly behind the existing highrises.

134. An additional Riverview planning document was submitted to CMHA by GCA in April 2001. In relevant part, the document noted the following:

- Based upon previous stability studies, any "'remediation must, of necessity, include a series of inclinometers and survey points so that extended monitoring, over an approximate 12 to 18 month period, can be conducted to verify stability *prior* to the development of the unstable area.'"

- Prior to construction of any structures "located along the panhandle portion of the site (stretching from Franklin Avenue to Detroit Avenue," "West 25th Street will need to be narrowed by approximately 2-3 lanes."

- Because of the site's instability, "significant site remediation will be required before any development can occur on the unstable portions of the site along the east side of West 25th Street."

- During a June 6, 2000, public meeting, area residents expressed concern "regarding the stability of the hillside and the significant public investment that might be needed to build at the Riverview location."

- Remediation would cost between $10 and $20 million.

135.  Further, GCA stated that its "assumption" in preparing the Riverview redevelopment plan was to construct buildings "only on land that is stable"—that is, the land immediately behind the Towers and adjacent to West 25th Street.  Thus, GCA's plan excluded construction on much of the same land that CMHA proposed to develop in its HOPE VI Grant Application.

136.  Although the GCA planning document varied dramatically from CMHA's original proposal to HUD due to the instability of the Riverview, CMHA again failed to disclose to HUD the contents of the planning documents or the findings it was based upon.  Notably, this report immediately doubles the cost of potential remediation of the site but, upon information and belief, this revised information was not provided to HUD.  This failure represented a breach of CMHA's continuing obligation to apprise HUD of all changes to the scope of the project.

137.   In addition to the GCA study, CMHA commissioned a study by URS

Greiner Woodward Clyde.  In April 2000, a slope stability evaluation by URS was

released ("2000 Study").

138.   The 2000 Study found, among other things, "active slope failures" that "[i]f

left in its [sic] current conditions, these failures may have long-term implications to the

subject site."  The study further observed:

>    Considering these conclusions, future development similar to the current configuration, will most likely not impact stability of the slope.   However, earthquake loading or changes to the current configuration, e.g., ***building low-rise structures closer to the edge of the slope, constructing high-rise structures, developing the face or toe of the slope, etc., could result in slope instability.***

>    One method of addressing the potential for slope instability is to employ a remedial solution to stabilizing the entire slope.  Considering the cost analyses presented in the [1995 Study], stabilizing the entire slope may not be cost effective, . . .

>    * * * *

>    Considering the results of this study, future developments must be evaluated with respect to slope stability on a case-by-case basis, . . .

Emphasis added.

139.   Upon information and belief, CMHA also withheld the 2000 Study from

HUD in breach of its obligation to provide any relevant information regarding the

Riverview site.

140.   On August 13, 2001, Telesis Corp., in response to a Request for

Proposals ("RFP") by CMHA, submitted a Riverview redevelopment plan.  Therein,

Telesis noted:

>    Preliminarily, without the benefit of meetings with these firms or independent review of their findings, we concur with the recommendation that structures only be located on the identified stable zones. Telesis will contract with specialized engineering firms to perform additional work to verify Lewin and URS

investigations and conclusions and satisfy all requirements of the City, County, and State agencies and the project lenders and investors.

The proposal further opined:

> Significant remediation is required before any development on the unstable or marginally stable portions of the site can occur. Potential methods for slope stabilization include the construction of a retaining wall, buried stone columns, or a bulkhead along the river. **These site improvements are estimated to require an investment of $15 to $20 million...**

Emphasis added.

141.   Upon information and belief, CMHA did not disclose Telesis' proposal to build on only "identifiable stable zones" to HUD, nor their similar recommendation that site remediation was 150- 200% more than disclosed to HUD..

142.   On June 1, 2002, CMHA selected Telesis Corp. to manage the Riverview redevelopment.

143.   In September 2003, yet another geotechnical evaluation was completed, this time by BBC & M Engineering, Inc.  This study was not commissioned by CMHA, but rather by Parsons Brinckerhoff, an engineering firm hired by the Ohio Department of Transportation.  The purpose of the study was to evaluate the feasibility of constructing a "West Bank Connector," a roadway to connect the highway system with a separate development in the city.

144.   The 2003 Study's Executive Summary observed:

> It is the conclusion of this report that there is evidence of a deep ancient slide plane on the west side of the Cuyahoga River between the Detroit-Superior Bridge and the Columbus Avenue Lift Bridge and that portion of this ancient slide plane may have been reactivated by the previously mentioned filing and regrading operations.
>
> * * * *
>
> Due to the presence of the deep-seated failure surface running continuously from the upper plateau the river, any development along the upper

-37-

terrace adjacent to West 25th Street will have an impact on the stability of the proposed West Bank Connector.

145.    The 2003 Study recommended that additional testing was necessary prior to development of Riverview:

The possible presence of an ancient slide surface, a portion of which that [sic] may have been reactivated by the regrading and filling operations along the upper terrace during the late 1950's and early 1960's [sic] should be thoroughly investigated. *In particular, the depth, orientation and extent of such a slide surface should be documented throughout the entire study area. Once having established whether or not it actually exists, the global stability of the slope area should be reevaluated and the stability models should be refined.* With refined and calibrated stability models, stabilization alternatives for the deep-seated failure should be reevaluated.

*The stability of the 'apparently' stable Riverview Terrace area should also be thoroughly investigated.*

A geotechnical subsurface investigation should be conducted for the entire area along Riverbed Street that is affected by the smaller slides.  Surface geometry and bathymetry data should be collected and stability models should be developed and calibrated.  Various stabilization alternatives should then be evaluated and the impact of these should be considered in terms of the global stability of the entire slope against a deep-seated failure.

Calibration of both sets of stability models (deep-seated failure and smaller failures) will require the installation of instruments to monitor pore water pressures and deformations in the slope.  Additional laboratory testing will be required to develop more realistic estimates of soil strength (both short-term and long-term) and for small strain and large strain conditions.

In order to address potential seismic design issues for slope stability consider new construct on the upper terrace, a seismic characterization of the subsurface conditions along the slope will also be necessary.

Emphasis added.

146.    Upon information and belief, CMHA knew of the existence of the 2003 Study, but yet again elected not to disclose it to HUD in violation of its duty to do so.

-38-

147.   This additional information, which modified the development plan, would have triggered new environmental assessment of the existing site before additional HUD funds were expended.

148.   On April 8, 2005, CMHA commissioned another soil stability study, which was completed by EDP Consultants, Inc. ("2005 Study").

149.   CMHA commissioned the 2005 Study to address specifically the need to remedy the slope prior to development.  As noted in the study, "EDP Consultants was engaged to evaluate the stability of the hillside and recommend a method or methods of stabilization because it was recognized that construction at the top of the slope would not be practical until the slope is stabilized."

150.   The 2005 Study concluded that "construction of permanent structures with a setback of at least 250 feet from the top of the existing slope would involve relatively little risk of future damage to the buildings due to slope failures."  The study went on to note that additional analyses would be necessary, including:

- Further refinement of soil parameters;
- Search for additional local critical failure surfaces;
- Evaluation of other stabilization concepts;
- Stability under seismic loading; and
- Reliability analysis.

151.   Additionally, the 2005 Study estimated costs to remedy the slope between $20 million to $25 million.  Of note, these numbers differed vastly from the previous remediation numbers and resulted from, for the first time, a broader study of the site. The 1995 study, for example, proposed remediation of the slope north of Riverview at a cost of $10-15 million, but did not study the remainder of the site.

-39-

152.    On September 30, 2005, CMHA sent a letter to HUD in response to the

2005 Study in which it disclosed the study's results and stated that new proposals were

necessary because the Riverview site was determined to be unbuildable.

Notwithstanding the 45 years of recommendations regarding massive instability of the

site, CMHA represented that the massive site deficiencies were breaking news, and that

the study's conclusions contradicted its assumption that site was "safe to build on"

beyond 50 feet west of the escarpment.

153.    Specifically, the letter stated:

This revision is necessary because CMHA recently learned that the site for the
Riverview project is unbuildable, which requires the development of a new
Revitalization Plan."

* * * *

CMHA always assumed that the area beyond 50 feet was safe to build on, and
the stability of the hillside beyond 50 feet west of the escarpment was the basic
premise for proposing this site for redevelopment under the Hope VI program.

That premise was shattered in April 2005 with the release of an
engineering report by EDP Consultants, which CMHA and Telesis undertook to
confirm the safety of this site.  Their preliminary findings found the slope to be
unstable, as had the other studies, but went further to suggest that there should
be a setback line for construction of permanent structures of at least 250 feet
from the escarpment line at the top of the slope. As indicated on the attached
map, this 200 foot extension of the buildable land area virtually eliminates the
entire site for development."

154.    Despite its assertion to HUD to the contrary, CMHA knew—from at least

1960 when Dr. Housel released his report—that the Riverview site was and remains

afflicted with serious soil stability issues, issues which were not made known in full to

HUD until nearly ten years after the HOPE VI Grant was initially approved.

155.    CMHA continued to obtain additional information regarding the extensive

soil and environmental problems at the site both before and after its application that it

-40-

did not disclose to HUD. Instead, it waited until 2005, almost 10 years after applying for HOPE VI funds, to disclose to HUD that the site was unbuildable.

156. The information that CMHA obtained in the post-1995 studies was required to be disclosed under its ongoing reporting obligations and would have triggered a new environmental assessment of the site.

157. Instead, HUD spent HOPE VI funds through 2005, and currently continues to improve the site through an Energy Performance Contract.

158. In addition to the extensive information already in its possession, CMHA should have expeditiously obtained extensive soil and erosion data in compliance with Ohio Administrative Code regulations that would have revealed the extensive problems with the site—including the existing buildings—long before its 2005 stop-work letter.

159. Under 24 C.F.R. § 941.203(b)(2), CMHA was required to comply with applicable state and local law, including Ohio Admin. Code 4101:1-18-01and Ohio Admin. Code 1501:15-01-03, requiring a soil stability study on all questionable soils and the submission of a sediment control plan to the appropriate state agency.

160. Had CMHA completed the soil study and erosion plan as mandated by Ohio Admin. Code, the fact that the Riverview site is largely unsuitable for construction would have been revealed long before 2005.

161. Between 1997 and 2005, CMHA expended at least $16,049,947.61 in federal funds.

### H. CMHA'S 2005 Letter Belatedly and Only Partially Disclosed Site Conditions and Enabled CMHA to Continue to Expend HUD Funds.

162. In its 2005 letter to HUD requesting a major deviation from the original Riverview proposal based upon soil instability, CMHA discussed the findings of the

-41-

2005 Study and indicated, for the first time ever, the existence of prior evaluations, including the 1960 Study.

163. CMHA did not disclose the scope of the findings of those studies. Instead, it represented that the prior study supported the development plan and that the 2005 study was new information which contradicted all prior studies.

164. CMHA failed to disclose that the conclusions of prior studies were consistent with the findings of the 2005 Study. Specifically, CMHA failed to disclose that the prior studies had consistently concluded that no development could occur before significant extensive study because of massive, unknown instability at the site. For example, the 1960 Study concluded:

> observation of both settlement and lateral displacement be initiated at the earliest opportunity so that some reliable measure of the movement would be available before construction of the buildings was actually undertaken. . . .

The need for additional and intensive study of the slope was echoed in the 1995 Study:

> no development of any part of the site should be performed without careful analysis of the surface and subsurface conditions and the effects of the development on both the existing and potential instability.

The 2003 similarly expressed the need for extended evaluation:

> A geotechnical subsurface investigation should be conducted for the entire area along Riverbed Street that is affected by the smaller slides. Surface geometry and bathymetry data should be collected and stability models should be developed and calibrated. Various stabilization alternatives should then be evaluated and the impact of these should be considered in terms of the global stability of the entire slope against a deep-seated failure.

165. Moreover, CMHA failed to discuss the foundation instability present at the Towers.

166. Relator was advised by EDP consultants that they believed that the Towers are plagued by ground movement and, in their opinion, the Towers would not

have been constructed had modern instrumentation been available at the time the 1960 Study was conducted.  As a result and as initially planned, EDP fully expected to conduct a phase II foundation test to comprehensively determine the condition of the foundation and ground supporting the existing buildings for CMHA.

167.   Relator was further advised by EDP consultants that the foundation tests were cancelled by CMHA immediately prior to its 2005 letter to HUD.

168.   CMHA also cancelled other assessments, such as scheduled evaluations of the sewers and underground utilities.  These additional assessments had been recommended as a result of a preliminary geotechnical report that that there may be underground storage tanks and possible petroleum or chemical spills on the site. Memorandum from Telesis Corp. on Riverview Development Progress to CMHA (Mar. 31, 2004).

169.   Neither the existing foundation problems nor the cancelled testing was disclosed to HUD in the 2005 letter.

170.   Rather, despite its knowledge that the Towers were built on problematic soil, CMHA represented to HUD that the area beyond 250 feet was buildable—thus, the Towers were not threatened by the slope instability.

171.   Upon information and belief, CMHA has never disclosed this information to HUD.

172.   Because HUD remains ignorant of the soil and foundation problems associated with the Towers, HUD approved an Energy Performance Contract between CMHA and Siemens Building Technologies to update the Towers, and other CMHA

properties, with energy-efficient appliances and fixtures.  In total, the contract amounts to an expenditure of $33.6 million.

173.    Additionally, in 2008, CMHA expanded the parking lot behind the Towers to more than an acre in size, also on soil plagued by instability.

174.    Currently, significant foundation and soil stability problems loom over the entire Riverview site, causing massive stability problems in the entire area, including on the adjacent road and riverbank.

175.    CMHA's failure to disclose and address these issues over the last many decades has far-reaching consequences to the future use of that site and surrounding sites.

I.      **CHMA's Conduct Violated the False Claims Act.**

176.    CMHA knowingly withheld information it was required to provide under the NOFA, the application requirements, and applicable law and regulation.

177.    CMHA continued to withhold information from HUD despite knowledge that its entitlement to HOPE VI funds was conditioned on its obligation to provide HUD with updated information regarding physical site conditions.

178.    Although CMHA knew that the Riverview site was unstable well before the 2005 Study was released, CMHA failed to provide updated site information to HUD. CMHA did not, prior to 2005, reveal the existence or the findings of either the 1960 Study, the 2000 Study, or the 2003 Study to HUD.  Upon information and belief, CMHA has never provided these studies to HUD.

179.    The Riverview Grant was obtained because CMHA (a) knowingly withheld from HUD and its environmental reviewers—both during and after the application process—information which was critical and thus material to HUD's decision to award

-44-

the grant; (b) falsely certified compliance with various federal and state regulations requiring the disclosure of pertinent site conditions and the completion of a comprehensive soil study; and (c) knowingly misled HUD regarding the true cost of remedying the Riverview site. By concealing these practices, CMHA falsely represented its eligibility for HOPE VI funds and for continued payment from HOPE VI funds.

180.   Each and every claim for reimbursement submitted under the Riverview Grant, pursuant to the voucher system on HUD Form 50080-URP, was a false claim.

181.   Because the grant application was used by CMHA as the means by which it obtained the Riverview grant, the application constituted a false or fraudulent record used to get a false or fraudulent claim paid, in that CMHA used it with the intention of ultimately obtaining reimbursement for claims it knew would be false.

182.   Upon information and belief, additional funds have been paid out by HUD pursuant to the Riverview Grant since September 2006. All these sums are proceeds of false claims submitted by CMHA.

183.   Additionally, CMHA's knowing violations of the Riverview Grant described herein have caused the submission of false claims pursuant to additional grants from HUD to CMHA. HUD has awarded CMHA various grants before and since 1996 for the modernization and improvement of several CMHA properties, including the Riverview Towers. Although unconnected to the Riverview HOPE VI Grant, these additional grants are necessary sources of funding to CMHA. For example, in 2008, CMHA expended funds to expand a parking lot behind the south Riverview Tower without, upon information and belief, obtaining the necessary permits.

-45-

184.    CMHA knew that disclosing the soil stability problems at the Riverview site would threaten continued funding for the Towers. Thus, CMHA knowingly withheld this information from HUD in order to ensure the ongoing stream of federal funds into the Towers project.

185.    Information regarding the stability of the soil at Riverview was and remains material to HUD's decision to continue funding the Towers modernization efforts. Because CMHA knowingly withheld this material information, each and every claim submitted to HUD by CMHA regarding development at Riverview was false.

## COUNT I

### Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)

186.    Relator incorporates and re-alleges the paragraphs above as if fully set forth herein.

187.    The Defendant, by and through its agents, officers, and employees, knowingly presented or caused to be present to officers or employees of the United States Department of Housing and Urban Development false claims for payment pursuant to HOPE VI Grant No. OH12URD003I196 in violation of 31 U.S.C. § 3129(a)(1).

188.    In engaging in the conduct alleged above, the Defendant acted "knowingly" as that term is defined in 31 U.S.C. § 3729(b), in that the Defendant had actual knowledge of the information; acted in deliberate ignorance of the falsity of the information; or acted in reckless disregard of the falsity of the information.

189.    As a result of the Defendant's violations of 31 U.S.C. § 3729(a)(1), the United States has suffered damages in an amount to be determined at trial.

## COUNT II

### Violation of the False Claims Act, 31 U.S.C. § 3729(a)(2)

190. Relator incorporates and re-alleges the paragraphs above as if fully set forth herein.

191. The Defendant, by and through its agents, officers, and employees, knowingly made, used, or caused to be made or used, false records or statements to get false claims paid or approved by the United States Department of Housing and Urban Development pursuant to HOPE VI Grant No. OH12URD003I196.

192. In engaging in the conduct alleged above, the Defendant acted "knowingly" as that term is defined in 31 U.S.C. § 3729(b), in that the Defendant had actual knowledge of the information; acted in deliberate ignorance of the falsity of the information; or acted in reckless disregard of the falsity of the information.

193. In engaging in the conduct alleged above, the Defendant intended the United States Department of Housing and Urban Development to rely upon the false records or statements in its decision to pay the false claims described herein.

194. As a result of the Defendant's violations of 31 U.S.C. § 3729(a)(2), the United States has suffered damages in an amount to be determined at trial.

**WHEREFORE**, Relator requests the following relief:

A. Judgment against the Defendant for three times the amount of damages the United States has sustained as a result of the Defendant's actions, plus a civil penalty of $11,000 for each violation of the False Claims Act.

B. 25% of the proceeds of this action if the United States elects to intervene, and 30% if it does not.

C.    Relator's attorneys' fees, costs, and expenses.

D.    Such other relief as the Court deems just and appropriate.


Respectfully submitted,

Jennifer M. Verkamp (0067198)
Frederick M. Morgan, Jr. (0027687)
Morgan Verkamp LLC
700 Walnut Street, Suite 400
Cincinnati, Ohio 45202-2015
Tel:  (513) 651-4400
Fax: (513) 651-4405
Email: jverkamp@morganverkamp.com
          rmorgan@morganverkamp.com

*Attorneys for Relator*